IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| In re:<br><br>INTERNATIONAL SUPPLY CO.,<br><br>    Debtor,<br><br>_____<br><br>SHELDON STONE, not individually but solely as trustee of the International Supply Co. Creditor Trust,<br><br>    Plaintiff-Appellee,<br><br>v.<br><br>CITIZENS EQUITY FIRST CREDIT UNION,<br><br>    Defendant-Appellant. | Case No. 22-cv-3066<br><br><br>Appeal from:<br>Adversary Case<br>No. 17-08049<br>Bankruptcy Case<br>No. 15-81467<br><br><br>Honorable Mary P.<br>Gorman, presiding |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Defendant-Appellant, Citizens Equity First Credit Union ("CEFCU"), appeals the order of the Bankruptcy Court finding two payments made to CEFCU by Plaintiff-Appellee International Supply Co. ("ISCO") on August 2, 2013, and August 16, 2013, were fraudulent and subject to avoidance under 740 ILCS 160/5(a)(2) and 740 ILCS 160/6. Specifically, CEFCU contests the Bankruptcy Court's use of multiple tests to determine insolvency and constructive fraud and insists that only one test is permissible. Because both 740 ILCS 160/5(a)(2) and 740 ILCS 160/6 permit the use of multiple tests, the Bankruptcy Court properly ruled in favor of ISCO. The decision of the Bankruptcy Court is AFFIRMED.

## I. BACKGROUND[1]

On September 24, 2015, ISCO filed its voluntary petition under Chapter 11 of the Bankruptcy Code and, shortly thereafter, sought permission to sell substantially all its assets. (A432). ISCO's creditors then established a creditor trust and Sheldon Stone was appointed as the Trustee of the creditor trust. (*Id.*). He was vested with the authority to pursue causes of action for the benefit of the creditors, including actions to avoid and recover fraudulent conveyances under the Bankruptcy Code and applicable law. (*Id.*).

On September 22, 2017, ISCO filed a 10-count complaint against CEFCU and sought to avoid transfers of money from ISCO to CEFCU pursuant to the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act ("IUFTA"). (A19). ISCO alleged that the transfers made to CEFCU in August 2013 were made for the benefit of Lee Hofmann, who owed money to CEFCU, and that ISCO did not receive reasonably equivalent value in exchange for the transfers. (A25; A434). The trial focused on the nature of the transfers from ISCO to CEFCU in August 2013. (A24; A437). The disputed issues were (1) whether ISCO was insolvent when the transfers were made or became insolvent by reason of the transfers, and (2) whether ISCO received reasonable equivalent value for all or some portion of the transfers it made. (A437).

At trial, Bradley Sargent, a certified public accountant, testified for ISCO and prepared a report analyzing whether ISCO was insolvent. (A437; A559-60). He opined on

---

[1] The Bankruptcy Court sets forth the facts underlying this appeal in detail in the Opinion issued on March 30, 2020. In this Opinion, the Court sets forth only those facts necessary to resolve this appeal.

the issue of ISCO's solvency based on the three tests prescribed by 11 U.S.C. § 548 – the balance sheet test, the cash flow test, and the adequate capital test. (A439; A568). Under the balance sheet test, he concluded ISCO had positive equity from 2011 to 2013, but negative equity in 2014. (A446; A630). This means that the ISCO passed the balance sheet test for 2011, 2012, and 2013, but failed the test for 2014. (A446; A630). Sargant explained that the balance sheet test demonstrated positive earnings and earning capacity but was flawed in that it did not contemplate the shareholder advances that correlated with ISCO's increasing liabilities. (A446; A630-32). Under the cash flow test, which demonstrates ISCO's ability to pay its debts as they become due, Sargent determined ISCO failed the test in each of the four years observed. (A446-48; A669; A642). Under the adequate capital test, which demonstrates whether an organization has adequate capital to support its expenses and obligations, Sargent also concluded that ISCO was insolvent at all relevant times. (A449-50; A655).

CEFCU called Neil Gerber, another certified public accountant, as its expert witness. (A451; A708). Mr. Gerber prepared a report regarding the issue of ISCO's insolvency using all three tests. (A710-11). Like Sargent, he concluded that ISCO passed the balance sheet test from 2011, 2012, and 2013. (A452; A739-40). Defense counsel then asked Gerber during direct examination about the cash flow test. (A791). Regarding the cash flow test, Gerber opined ISCO would be considered solvent if refinanced debt was considered as a cash source but admitted that, if excluded, ISCO would be considered insolvent under the test. (A455; A777-78; A803; A833). He also concluded that ISCO would pass the adequate capital test because of its cashflow and the added intangible

value of ISCO's good will. (A455-56; A781). The "good will" included its reputation, products, customers, workforce, technologies, and other qualitative factors. (A779-80).

When Sargent was recalled as a witness, he explained that Gerber's reasoning regarding the cash flow test was not accurate because it did not consider the fact that ISCO's refinanced debt did not create cash flow. Instead, it only extended the maturity date on the debt. (A460; A893).

During its closing argument, counsel for CEFCU argued: "I think it's clear to the Court that the most critical portion of this case revolves around the cash flow test, with respect to solvency." (A914). CEFCU then focused its arguments on explaining why Gerber's analysis regarding the inclusion of refinanced debt in the cash flow analysis was proper. (A914-16).

The court agreed with Sargent's analysis and ruled that based on all three insolvency tests, ISCO was insolvent before, at the time of, and after the CEFCU transfers were made in August 2013. (A466-78). The Bankruptcy Court explained that the three tests are "regularly relied on by courts deciding issues of insolvency under both the [Bankruptcy] Code and the IUFTA." (A467). The court also found that ISCO did not receive reasonably equivalent value for either transfer. (A478-88). As such, the court concluded both transfers were constructively fraudulent and avoidable. (A489-96).

CEFCU timely filed a Notice of Appeal from that order on April 26, 2022. (A920–22). On May 4, 2022, the Bankruptcy Court issued an order awarding certain taxable costs against CEFCU. (A925–28). CEFCU timely filed a Notice of Appeal from that order on May 16, 2022. (A933–48). CEFCU argues on appeal that the Bankruptcy Court erred in

finding ISCO was insolvent and that the 2013 payments were fraudulent. Specifically, CEFCU contends that the cash flow and adequate capital tests are extra-statutory and were improperly utilized by the Bankruptcy Court.

## II. ANALYSIS

### A. Standard of Review

The Court has appellate jurisdiction over this matter. *See* 28 U.S.C. 158(a)(1) (providing that district courts have jurisdiction to hear an appeal from a final judgment, order, or decree). aThe Court reviews the Bankruptcy Court's factual findings for clear error. *Ojeda v. Goldberg*, 599 F.3d 712, 716 (7th Cir. 2010). Whether an entity is insolvent is a question of fact. *Plankinton Bldg. Co. v. Grossman*, 148 F.2d 119, 125 (7th Cir. 1945). Whether the Bankruptcy court employed the correct legal standard is subject to *de novo* review. *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### B. Count I

At the core of this case is whether constructive fraud and insolvency may only be proven by the balancing sheet test, or whether other measures may be introduced to demonstrate constructive fraud and insolvency. 11 U.S.C. § 544(b) allows a trustee to bring a state law cause of action in the context of a bankruptcy proceeding. Here, the bankruptcy proceeding was brought under two state laws: 740 ILCS 160/5 and 740 ILCS 160/6. (A11-17). Because both statutes — 740 ILCS 160/5 and 740 ILCS 160/6 — contain different elements, this Court will first assess whether the use of the cash flow and adequate capital tests was proper under Section 106/5. Second, this Court will analyze whether the use of the other tests was proper under Section 106/6.

To demonstrate constructive fraud under Section 160/5(a)(2) of the IUFTA, the debtor must have made the transfer without receiving a reasonably equivalent value in exchange, and either: (1) the debtor's remaining assets were unreasonably small in relation to the business or transaction, or (2) the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. 740 ILCS 106/5(a)(2).

"Unreasonably small assets" is not defined in the IUFTA. *See In re Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. 558, 635 (Bankr. N.D. Ill. 2013). But courts have recognized that "unreasonably small capital involves financial circumstances in which the debtor is left barely solvent and in a condition where bankruptcy or liquidation is substantially likely" and "an inability to generate sufficient profits to sustain operations." *In re Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. at 635. This is akin to the adequate capital test described by both experts. In his report, Sargent described the adequate capital test as determining "if the debtor has the available capital to operate the business for a specific period, typically one year." (A315). Gerber's definition was similar, defining the test as determining "whether the debtor has adequate capital relative to its assets, and able to meet its expenses and debt obligations as they become due, typically within one year." (A404). Since the adequate capital test measures unreasonably small assets, it is an appropriate test under the IUFTA.

Section 5(a)(2) of the IUFTA also provides that a transfer is fraudulent if the debtor has incurred debts beyond his ability to pay as they become due. 740 ILCS 106/5(a)(2)(B). Sargent described the cash flow test as determining "if the debtor has cash available to

meet all debt obligations for the period." (A314). Gerber's definition was substantially similar. (A402). If the debtor fails the cash flow test, then it is logical that they have "incurred debts beyond his ability to pay as they become due." 740 ILCS 106/5(a)(2)(B). Thus, the cash flow and adequate capital tests were properly used in the Bankruptcy Court's analysis of whether the transactions were avoidable under Count I pursuant to 740 ILCS 106/5(a)(2). As such, the Bankruptcy Court applied the proper legal standard.

Additionally, the Bankruptcy Court's finding of constructive fraud based on the cash flow and adequate capital tests is not clearly erroneous. Insolvency is a question of fact, and the bankruptcy court has broad discretion to determine insolvency. *In re Doctors Hosp. of Hyde Park, Inc.*, 360 B.R. at 853. In determining insolvency, the Bankruptcy Court may consider expert testimony if it determines the expert's information and results are reliable. *See In re World Marketing Chicago, LLC*, 574 B.R. 670, 681 (Bankr. N.D. Ill. 2017). A Bankruptcy Court's determination that one expert witness is more credible than another will not be disturbed unless the finding is clearly erroneous. *USA Gymnastics v. Liberty Insurance Underwriters, Inc.*, 46 F.4th 571, 589 (7th Cir. 2022).

For example, the Seventh Circuit found that the Bankruptcy Court's finding of insolvency was not clearly erroneous when the Bankruptcy Court relied on an expert's analysis of data to make a finding of insolvency. *In re Chicago Management Consulting Group, Inc.*, 929 F.3d 803, 809-10 (7th Cir. 2019). The Seventh Circuit held that "so long as the bankruptcy judge accepted the veracity of the Quickbooks data and the reliability of [the expert's] methods, a finding of insolvency was inevitable." *In re Chicago Management Consulting Group, Inc.*, 929 F.3d at 809-10. The Seventh Circuit also emphasized that

"[w]hen there are two permissible views of the evidence, the ... choice between them cannot be clearly erroneous." *Id.* at 809, *citing Dexia Crédit Local v. Rogan*, 629 F.3d 612, 628 (7th Cir. 2010) (alterations in original).

Here, the Bankruptcy Court noted there were some mathematical discrepancies in Gerber's cash flow analysis that resulted in him "[t]o some degree... double counting the contract revenue," because he added in the full contract revenue, even though some of the payments were already included elsewhere in the calculation. (A473-74). Further, Gerber adjusted for only a portion of the expenses, rather than deducting all costs related to the project. (A474-75). Based on the skewed calculations, the Bankruptcy Court placed more weight into Sargent's analysis and find that his cash flow and adequate capital calculations were more persuasive. Just as the Bankruptcy Court in *In re Chicago Management Consulting Group, Inc.*, the Bankruptcy Court's reliance on Sargent's interpretation was not clear error, as it accepted the veracity of his data and found his interpretation to be reliable.

Because there was no mistake in law and the factual conclusion was not clear error, the Bankruptcy Court's holding as to Count I will not be disturbed.

### C. Count II

Count II was brought pursuant to 740 ILCS 106/6, which requires a showing that the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time or became insolvent because of the transfer or obligation. 740 ILCS 160/6. The IUFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS

160/3(a). The IUFTA also provides that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." 740 ILCS 160/3(b).

CEFCU relies on *Baldi v. Samuel Son & Co.*, 548 F.3d 579 (7th Cir. 2008), for the proposition that the balance sheet test is the only measure of insolvency. However, in that case, the only issue was whether contingent costs should be considered during a calculation under the balance sheet test. *Baldi*, 548 F.3d at 583. The Court plainly stated that "undercapitalization" (which, as noted, is measured by the adequate capital test) is "not a synonym for insolvency." *Id. Baldi* also relied on *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1069-71 (3d Cir. 1992), wherein the court distinguished between undercapitalization and an inability to pay debts as they become due. The court in that case similarly found that undercapitalization was not equivalent to insolvency. *Id.* However, the court's distinction between undercapitalization and an inability to pay debts as they become due suggests that the latter is also a valid measure of insolvency.

As noted previously, the cash flow test may be used to determine whether a debtor has an inability to pay debts as they become due. *See Supra* II.B. Based on the reasoning in *Moody*, the cash flow test is a valid measure of insolvency. In fact, several courts have recognized that *both* the balance sheet and cash flow tests "closely" track the insolvency tests under Section 3 of the IUFTA. *See Kerr-Mcgee Chem. Corp. v. Lefton Iron & Metal Co.*, 2000 U.S. Dist. LEXIS 24170, at *31 (S.D. Ill. Aug. 9, 2000); *Metrou v. Kaczor-Mauriello*, 2022 Bankr. LEXIS 1153, at *33 (Bankr. N.D. Ill. Apr. 27, 2022).

It is also noteworthy that during its closing argument, counsel for CEFCU argued: "I think it's clear to the Court that the most critical portion of this case revolves around

the cash flow test, with respect to solvency." (A914). It then focused its arguments on explaining why Gerber's analysis regarding the inclusion of refinanced debt in the cash flow analysis was proper. (A914-16). This suggests that even CEFCU's counsel recognized that the cash flow test could be used to determine insolvency. *See Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (considering a party's arguments in a prior proceeding, and noting "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.").

The Bankruptcy Court's use of the cash flow test for its analysis was proper. Additionally, as noted previously, the Bankruptcy Court's findings of fact were not clear error because it found Sargent's analysis of the cash flow test to be more reliable than Gerber's anlaysis. (A466-78); *See In re Chicago Management Consulting Group, Inc.*, 929 F.3d at 809 ("When there are two permissible views of the evidence, the ... choice between them cannot be clearly erroneous."). This finding was not clearly erroneous due to the mathematical discrepancies in Gerber's analysis. (A473-75). Therefore, the Bankruptcy Court's determination was not clear error. *USA Gymnastics*, 46 F.4th at 589 ("We will not disturb a [bankruptcy] court's finding that one expert witness in a bench trial is more credible than another unless the finding is clearly erroneous.").

### D. Costs

CEFCU makes no argument as to the award of costs beyond its argument that the Bankruptcy Court erred in applying the incorrect legal standards when determining

insolvency. (Doc. 29 at 23). Because the Bankruptcy Court did not err when ruling in favor of ISCO on Counts I, II, and VIII, the Court correctly awarded costs in favor of ISCO.

### III. CONCLUSION

For the reasons stated, the decision of the Bankruptcy Court is AFFIRMED. Also, the award of costs in favor of ISCO is AFFIRMED. This case is closed.

ENTER: September 11, 2023

_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE